IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF SOUTH CAROLINA
COLUMBIA DIVISION

| | | |
|---|---|---|
| Charlene E. Tyler, | ) | C/A No. 3:09-1119-CMC |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| vs. | ) | OPINION AND ORDER |
| | ) | FINDINGS OF FACT AND |
| Palmetto GBA, | ) | CONCLUSIONS OF LAW |
| | ) | |
| Defendant.[1] | ) | |
| _____ | ) | |

Through this action, Plaintiff Charlene E. Tyler ("Plaintiff" or "Tyler"), seeks a determination that Defendant Palmetto GBA ("Defendant" or "Palmetto GBA"), abused its discretion when it denied Tyler's claim for severance benefits. The matter is now before the court on the parties' cross-motions for judgment on the written record. For the reasons set forth below, the court grants Defendant's motion and denies Plaintiff's motion.

**APPLICABLE LAW**

It is undisputed that the severance benefits at issue in this action were available to Tyler as a consequence of her employment with Palmetto GBA. The underlying benefit plan was sponsored by Blue Cross and Blue Shield of South Carolina and is designated the BCBS Severance Pay Plan ("SPP"). *See* Administrative Record ("AR")[2] at 23-38 (signed SPP dated October 1, 2003); AR at

---

[1] Through its answers to Local Rule 26.01 interrogatories, Defendant advised Plaintiff that it was improperly named and that its correct designation is Palmetto GBA, L.L.C. In the same document, Defendant agreed to accept service of an amended complaint with the proper name designation. Plaintiff subsequently filed an amended complaint but did not correct the naming error. The error is, however, waived given that Defendant has not raised it either in its answer to the amended complaint or in its motion for judgment. *See also* n. 4 (addressing failure to name Plan Administrator).

[2] The Administrative Record is found at Dkt. No. 25-2. For ease of reference, it is referred to as "AR" in this order.

39-53 (unsigned SPP with amendments as of October 24, 2005).[3] Tyler was eligible for benefits under the SPP because her employer, Palmetto GBA, is an "Affiliated Employer" as defined by the Plan. AR at 26 (SPP § 2.1).

Plaintiff relies on various letters and memoranda which address these benefits, and one which she asserts modified the terms of the plan or created an independent contract. All but one of these documents, however, identify the source of the benefits as the SPP or refer to the benefits as part of a "severance plan." *See* AR at 1-3 & 5-6 (memoranda and letters which refer to the SPP or a "severance plan"); AR at 4 (letter referring to extension of the release date but not the SPP). The Plan itself was available to Tyler at all times relevant to this action and this availability was drawn to her attention on at least two occasions. *See* AR at 2 (Feb. 15, 2007 letter which included information on how to locate the SPP on the "WebPort"); AR at 5 (June 20, 2007 memorandum including this same information).

Under these circumstances, it is clear both that the benefits at issue are those available under the SPP and that the SPP is an employee welfare benefit plan governed by ERISA. *See, e.g.,* 29 U.S.C. § 1002(1) (defining employee welfare benefit plan); 29 U.S.C. § 1003 (providing ERISA's scope of coverage); *see also* Dkt. No. 16 (text order denying motion to remand). The remedies available to Tyler are, therefore, limited to those provided under 29 U.S.C. § 1132(a)(1)(B) and (g). *See* Dkt. No. 17 (amended complaint referring to an ERISA claim but not identifying any specific

---

[3] There are two versions of the Plan in the record (a signed version dated October 1, 2003, and an unsigned version reflecting amendments "effective October 24, 2005." The terms of the two versions are, however, the same in all respects relevant to this litigation. The court will, therefore, refer to the signed version of the SPP through the remainder of this order. Both versions provide that a single document serves as both the formal "plan" and the "summary plan description." AR at 26 (SPP Introduction).

code sections). Any other claims stated or implied by the complaint or amended complaint are preempted by ERISA's complete preemption provisions. *See, e.g.,* 29 U.S.C. § 1144 (preemption provisions); *Pilot Life Ins. Co. v. Dedeaux*, 481 U.S. 41 (1987) (preempting state law claims for breach of contract and bad faith refusal to pay benefits under an insured employee benefits plan); *Makar v. Health Care Corp. of Mid-Atlantic*, 872 F.2d 80, 82 (4th Cir. 1989) ("After *Pilot Life*, . . . any contention that the state claims here are not preempted by ERISA would be frivolous.").

## STANDARD OF REVIEW

Section 6.4 of the SPP grants the Plan Administrator discretion to make coverage decisions such as those at issue in this action:

> The Employer and any persons acting in a fiduciary capacity at the direction of the Employer shall have maximum legal discretion to construe plan provisions and to make decisions concerning the operation and administration of the Plan including, but not limited to, the provision or denial of benefits, and such decisions shall not be subject to further review unless determined to be an abuse of the Employer's discretion by a court of law.

AR at 31-32 (SPP § 6.4). The Employer's discretionary authority is also addressed under Section 3.5 of the SPP as follows:

> **Participant's Benefits Not Vested.** No one under any circumstances is automatically entitled to a severance benefit. The Employer has the sole discretion to determine whether any one or more of the exclusions set forth in this Plan apply to an Employee's termination of employment.

AR at 28-29 (SPP § 3.5). The Plan is, however, funded by the Employer's general assets. AR at 30 (SPP § 4.5). The denial of severance benefits is, therefore, reviewed under an abuse of discretion

3

standard of review with recognition that the Plan Administrator/Employer operated under a conflict of interest.[4]

As recently clarified by the Fourth Circuit in light of *Metropolitan Life Insur. Co. v. Glenn*, __ U.S. __, 128 S. Ct. 2343 (2008), the presence of a conflict does not change the standard of review from the deferential standard generally applied in the presence of a grant of discretion to the Plan Administrator. *Champion v. Black & Decker*, 550 F.3d 353 (2008). Instead, the conflict is one factor which may act as a tie-breaker when other factors are closely balanced. *Id.*, 550 F.3d at 358 (quoting *Glenn*, 128 S. Ct. at 2351).

Under the abuse of discretion standard, the court is required to uphold the administrator's decision if it is reasonable, even if the court would have come to a different conclusion had it considered the matter independently. *See Ellis v. Metropolitan Life Ins. Co.*, 126 F.3d 228, 232 (4th Cir. 1997). A decision is reasonable if it is "the result of a deliberate, principled reasoning process and if it is supported by substantial evidence." *Id.* at 232 (quoting *Brogan v. Holland*, 105 F.3d 158, 161 (4th Cir. 1997)).

In deciding whether the decision satisfies this "reasonableness" standard, the court considers the following eight factors:

> (1) the language of the plan; (2) the purposes and goals of the plan; (3) the adequacy of the materials considered to make the decision and the degree to which they

---

[4] The SPP defines "Employer" as Blue Cross and Blue Shield of South Carolina, although it indicates that "Employer" may, in some contexts, also refer to Affiliated Employers. AR at 27 (SPP § 2.6). It also defines the Plan Administrator as the Employer, absent other designation (and none is suggested). *Id.* (SPP § 2.9). This suggests that Palmetto GBA, which is only an Affiliated Employer (SPP § 2.1), may not be properly named as a Defendant (as it is neither the Plan nor the Plan Administrator). Any such error has, however, been waived as it is not raised in the answer to the amended complaint or in the motion for judgment. For purposes of this order, therefore, the court deems Palmetto GBA to be the proper Defendant.

4

support it; (4) whether the fiduciary's interpretation was consistent with other provisions in the plan and with earlier interpretations of the plan; (5) whether the decisionmaking process was reasoned and principled; (6) whether the decision was consistent with the procedural and substantive requirements of ERISA; (7) any external standard relevant to the exercise of discretion; and (8) the fiduciary's motives and any conflict of interest it may have.

*See Champion*, 550 F.3d at 359 (quoting *Booth v. Wal-Mart Stores, Inc. Assocs. Health and Welfare Plan,* 201 F.3d 335, 342-43 (4th Cir. 2001)).

## DECISION OF THE COURT

Having fully considered the administrative record before the Plan and the memoranda of the parties, the court enters the following Findings of Fact and Conclusions of Law pursuant to Rule 52(a) of the Federal Rules of Civil Procedure. To the extent that any findings of fact represent conclusions of law, or vice-versa, they shall be so regarded.

## FINDINGS OF FACT

For some period of time predating February 15, 2007, and continuing until July 31, 2008, Tyler was an employee of Palmetto GBA, an entity affiliated with Blue Cross and Blue Shield of South Carolina ("BCBS"). As an employee of Palmetto GBA, Plaintiff was entitled to benefits under the BCBS Severance Pay Plan ("SPP"). *See supra* at 1-2.

**Plan Language.** As explained in the introduction to the SPP, its "purpose . . . is to provide financial assistance to certain employees whose termination from employment . . . is described within the terms and conditions of the Plan." AR at 26. Consistent with this purpose, Section 3.2 of the SPP provides as follows:

> **Events of Termination**. An Employee who is otherwise eligible to participate . . . who agrees to and executes the waiver of claims required under Section 3.4 and who is not ineligible under Section 3.3, shall be entitled to receive a severance benefit as determined under Article IV *if his or her position is terminated*.

AR at 27 (emphasis added).

5

Section 3.3 of the SPP provides that an employee is not entitled to benefits under the plan if his or her employment with the Employer

> results from a sale, reorganization, merger, spin-off, or any other change in the form of doing business *and the Participant is offered employment* by the Employer, a successor to the Employer, an Affiliated Employer, or a successor to an Affiliated Employer and such offered employment is *at a location within twenty-five (25) miles of the previous work location*.

AR at 27-28 (emphasis added). Benefits are also unavailable if the termination is the result of a "[v]oluntary resignation." AR at 28 (SPP § 3.3(b)).

On February 15, 2007, Tyler was provided with a letter informing her that her "position [was] scheduled to be eliminated on June 29, 2007." AR at 1. This letter advised Tyler that she was entitled to five weeks of severance pay under the SPP if she remained through her scheduled release date. *Id.* The letter also advised her of the requirement that she sign a release in order to receive benefits and some of the grounds on which she might be denied severance benefits under the SPP. *Id.* The letter also encouraged her to review the terms of the SPP and indicated where to locate the SPP on the "WebPort." AR. at 2.

On March 6, 2007, Tyler was provided with another letter which advised her that, to meet its contractual obligations, Palmetto GBA needed to "retain all staff currently employed . . . through the end date in their reduction in force notifications." AR at 3. The letter explained that this necessity made current employees who were subject to RIF notifications "eligible for additional severance in accordance with the [SPP.]" *Id.* (also referring to a separate human resources policy). The additional benefit was 13% of annual base salary (as of a specified date) and was available "if you work through your original release date." *Id.*

6

On Tuesday, June 19, 2007, Tyler received a memorandum from Steve Smith with the subject line: "Contract Extension." This memorandum shared the "positive news" that Palmetto GBA was extending its operations with Vangent through July 31, 2007, and had also submitted a "proposal to provide spike support [for Vangent] through February 28, 2008." AR at 4. The letter advised that "[e]ach of the permanent Palmetto GBA associates that received a reduction in force letter, will receive an extension letter as soon as we receive them from HR." The letter gave advance notice that the letters would be provided at some point the next day (Wednesday) and that each employee would need to decide whether to accept or decline the extension by noon on the following day (Thursday). Unlike the two prior letters, this letter did not include any express reference to the SPP. Neither, however, did it refer to any additional benefits.

On Wednesday, June 20, 2007, Tyler received a letter with the subject line "Extension of Release Date." AR at 6. This letter referred to the February 15, 2007 reduction notice and the initially scheduled release date of June 29, 2007. It then stated that the company was "able to retain your position longer than [it] originally anticipated" and "request[ed] that [Tyler] remain with the company until July 31, 2007 ('extended release date')." The letter included an "acknowledgment" section which allowed Tyler to decline (and keep her original release date) or accept the modified release date. It asked Tyler to make a decision and return the form by noon on Thursday, June 21, 2007. The block for accepting the extension read as follows:

> I accept the request for extended employment as outlined in this letter. I understand that all other terms and conditions of the reduction-in-force and the *severance plan* remain in effect and continue to apply, including but not limited to the settlement and release I signed which will remain in full force and effect.

AR at 6 (emphasis added). The letter itself does not indicate what impact accepting would have on the severance benefits.

7

The lack of detail in this letter apparently prompted questions which Steve Smith attempted to answer in another memorandum sent later that same day. AR at 5 (stating memorandum was "[b]ased on some feedback from the Managers in reference to our extension letters"). The subject line of this memorandum is "Important Severance Information." It is directed to "Palmetto GBA reduction in force associates only." *Id.*

This memorandum provided "some additional important information about the extension," stating, in part, as follows:

> 1. If you accept the extension you will receive **another 3% severance** on top of what you have now. *Please review My E-work/Manuals/Severance Plan pages 4-6 explain[ing] Basic and Additional Severance benefits if you have further questions.*
>
> 2. You are still able to continue applying for jobs within the company.
>
> 3. *If you accept the extension* **we will not rescind** *the reduction in force package that you currently have even if we are successful with the Vangent Spike Services Support Contract.* Here is the win-win plan we have in place for you if we win that contract.
>
> You will be terminated effective July 31, 2007 (I know that doesn't sound win-win but keep on reading), you will be paid your severance at that time based on the guidelines covered in the section above. Meaning nothing changes, you just get another 3% more. You will be immediately re-hired in a temporary status to Palmetto GBA . . . at your existing base pay and associated benefits. You will simply be hired for the defined term of the contract (Aug-Feb 28, 2008). After the initial start-up period you'll be able to continue to post for jobs as an internal candidate and reap all of the benefits associated with employment.
>
> I hope this clears up some misunderstanding and clarifies some points that will help you make an informed decision. If you have further questions please let me know.

*Id.* (bold in original, italics added).

Tyler signed the "accepted" section of the extension letter on June 21, 2007, but only after adding a handwritten notation (shown underlined below):

8

> I accept the request for extended employment as outlined in this letter<u>, and memo from Steve Smith of 6/20/07 (4:40 p.m.)</u>. I understand that all other terms and conditions of the reduction-in-force *and the severance plan* remain in effect and continue to apply, including but not limited to the settlement agreement and release I signed which will remain in full force and effect.

AR at 6 (emphasis added).

On June 29, 2007, Plaintiff received another memorandum relating to the changing work situation. This memorandum, written by Bruce Hughes, advised employees that "Palmetto GBA is confident that we will secure a new temporary work contract from Vangent." AR at 7. It then offered temporary positions (through "at least February 2008") explaining as follows:

> Due to the unique contract situation, interested contact center staff, scheduled to be released on June 29th and July 31st, will be paid their severance benefit if they work through their effective release date. Associates interested in these temporary Palmetto GBA assignments will need to complete an internal application to be moved into full time temp pool positions after their effective release date.
>
> Associates who decide to move to these temporary positions will be allowed to apply for internally posted positions after October 31st. If a full time position is secured within 1 year of receiving severance pay, the associate would not be required to pay back the basic severance but would need to repay a pro-rated portion of the enhanced severance benefit based upon the number of full months they have worked in the temporary position. This is the same arrangement used for all rehired associates.
>
> Temp pool positions are ineligible for severance pay, which means that at the end of the assignment no additional severance would be paid. . . .

AR at 7. Plaintiff did not desire and, therefore, did not apply for one of the temp pool positions.

On July 26, 2007, Palmetto GBA sent Plaintiff a letter titled "Withdrawal of Palmetto GBA Reduction Notice." This letter stated as follows:

> The reduction-in-force notice issued to you on February 15, 2007 is hereby rescinded. Our successful contract bid allowing us to continue our role in the Beneficiary Contact Center has eliminated the need for any further position reductions.

> We are pleased that this award has permitted us to withdraw this notice. Should you have any questions or wish to discuss this matter, please feel free to contact Robin Spires or your Human Resource representative.

AR at 9.

A longer memorandum was also sent out that same day to "Palmetto GBA RIF Status Associates." AR at 10-11. This memorandum explained that Palmetto GBA had secured a new two-year contract with Vangent, Inc. which eliminated the need for any further reduction of the workforce. It advised, in part, as follows:

> Now that the Vangent arrangement has become a normal, long-term contract, a reduction in force is no longer needed. Accordingly, because your position is not eliminated, you are no longer being "released and are not eligible for severance under our plan.
>
> I am very appreciative of your willingness to continue work on the earlier temporary contracts during these last several months. . . . We do want to recognize your loyalty and service to Palmetto GBA through a lump sum "recognition of service" bonus payment of $3,300 (gross). While this amount may or may not equate to the exact amount of the severance you would have received, I hope it demonstrates that we value your service and contribution to Palmetto GBA.
>
> I know some of this may be a bit confusing after such a whirlwind of change and uncertainty over the last several months. However, we want to focus on the fact that we were able to secure a long term contract that allows you to remain employed. Please feel free to ask your leadership team and/or the appropriate Human Resources representatives any questions you have.

AR at 10.

Tyler continued working through her previously scheduled release date, Tuesday, July 31, 2007. She failed to appear for work the remaining three days of that week (August 1-3, 2007). On Monday, August 6, 2007, she came to the office to drop off her employee badge, remove her personal belongings, and leave a written demand for $5,519 in severance benefits. AR at 12. In her written demand, Tyler relied on the statement in Steve Smith's June 20, 2007 memorandum stating

10

"If you accept the extension, we will not rescind the reduction in force package that you currently have even if we are successful with the Vangent Spike Services Support contract." AR at 12 (underlining in original).

The Plan denied Tyler's demand for payment by letter dated August 13, 2007. AR at 13. This letter stated that the June 20, 2007 memorandum on which Tyler relied had been clarified by the June 29, 2007 memorandum from Bruce Hughes, with the latter explaining that, to receive benefits and remain working, an employee would have had to accept a temporary position. The letter also noted that Tyler did not apply for such a position. In addition, it explained that the company had the right to rescind a reduction-in-force notice, which it had done. Although the letter denied the request for severance benefits, it noted that Tyler would still receive the $3,300 "loyalty bonus" despite her resignation. *Id.*

Tyler appealed the denial of severance benefits through the administrative review process set out in the SPP. The decision to deny benefits was upheld on appeal. AR at 14-21. It is undisputed that, through this process, Tyler exhausted her administrative remedies.

## CONCLUSIONS OF LAW

Tyler's decision not to return to work despite Palmetto GBA's rescission of the reduction-in-force precludes any entitlement to benefits under the plain language of the SPP and in light of the purpose of the plan. The court reaches this result regardless of whether it applies an abuse of discretion or de novo standard of review.

**Plan Language**. Considering the purpose of the SPP, and applying its plain language, the court concludes that the employer had the right to rescind the reduction-in-force notice up to and including the employee's final "release" date. The SPP was, after all, intended to provide financial

security to employees who *lost their jobs* due to the employer's decision to eliminate the employees' positions. *See* AR 26 (Introduction to SPP).

The plain language of the SPP, likewise, provides for payment of benefits when an employee's "position is eliminated," assuming all other criteria are met. SPP § 3.2 ("Events of Termination"). The SPP also provides that an employee is ineligible for severance benefits if he or she is offered other employment by the employer or a successor to that employer, assuming the new job location is within twenty-five miles of the former job location. SPP § 3.3 (introductory paragraph and (j)). The employer's decision not to discontinue a position, therefore, means that coverage is not triggered because the position was not eliminated. Such a decision also has the same effect as an offer of employment from a successor employer or elsewhere in the company.

In short, while it may be inconvenient to an employee to learn at the last minute that a planned job elimination will not occur, the SPP clearly allows the employer to make that determination and, when it does so, to also revoke any previously offered severance benefits. This possibility should come as no major shock to the employee given that the employer could have achieved the same result by finding the employee a job elsewhere in the company or with a successor employer. This is precisely what happened in Tyler's case. Thus, she was not entitled to benefits because her job was not eliminated.

The plain language of the SPP also precludes payment if employment ends due to "voluntary resignation." SPP § 3.3(b). Tyler's decision not to return to work after being advised that the reduction-in-force had been rescinded amounts to a voluntary resignation. Thus, benefits are precluded under this section.

12

It follows that Tyler, who could have continued in her same job, cannot prevail unless she establishes an adequate basis on which to override the plain language of the SPP. Tyler argues that Steve Smith's June 20, 2007 memorandum provides such a basis. She asserts that this memorandum became a binding contract when she signed the acceptance of the extension of her release date on June 21, 2007. She further asserts that the terms of this "contract" include a promise not to revoke the severance benefits referenced in Smith's June 20, 2007 memorandum and earlier correspondence. Finally, she argues that the later attempted clarification (Hughes June 29, 2007 memorandum) cannot modify the contract which was formed on June 21, 2007.

The first difficulty with Plaintiff's position is that such informal communications are not sufficient to modify or create an ERISA Plan. *See, e.g., Stiltner v. Beretta U.S.A., Corp.,* 74 F.3d 1473, 1480 (4th Cir. 1996). In *Stiltner*, the court found no new plan was created by representations regarding disability benefits made in an offer of employment because all the requirements for creation of a plan were not present. The court also noted that it was unreasonable to rely on such a letter when a written plan was in place. Here, there are no facts supporting creation of a separate plan and, as in *Stiltner*, there is a written plan which establishes the terms under which benefits are available.

Neither may Plaintiff claim some independent contract was created. *Id.* (rejecting attempt to recast a preempted state-law contract claim as a federal common law claim because no reasonable fact-finder could find an intent to override the terms of the plan). Clearly, the rights being addressed in the various letters and memoranda sent to Tyler were (or should) have been understood to relate to and derive from the SPP. The SPP was, in fact, expressly mentioned as the source of the rights in almost every relevant communication, including, most critically, in Smith's June 20, 2007

13

memorandum: the memorandum on which Tyler relies for the promise that the benefits would become irrevocable if she extended to July 31, 2007.

The only memorandum prior to the alleged creation of a "contract" which did not refer specifically to the SPP or generically to a "severance plan" was Smith's June 19, 2007 memorandum. However, that memorandum only alerted employees to the coming extension offer. It made no mention of any specific benefits accompanying that offer and, therefore, had no reason to refer to the SPP. Thus, the only pre June 21, 2007 memorandum which failed to mention the SPP also failed to "offer" any specific benefits. Under these circumstances, Tyler has neither a factual nor a legal basis on which to assert a claim for benefits under some contract independent of the SPP.

Plaintiff's interpretation of Smith's June 20, 2007 memorandum is, in any event, only one of two potential interpretations, the other being the interpretation now offered by Palmetto GBA: that the irrevocable right referenced in Smith's memorandum only applied to those employees who were terminated from their permanent positions as a result of the reduction-in-force, *then continued* as *temporary employees*. Significantly, once these individuals became temporary employees, they lost any further rights under the SPP. In short, they would have suffered an actual termination from their regular employment. Read in the context of Smith's full memorandum, this is the *better* interpretation. Read in the context of the SPP, it is the *only* reasonable interpretation. Given that Smith's June 20, 2007 memorandum may be read consistently with the SPP, the court finds no basis on which to give it a different reading.

This is not to say that Tyler was not genuinely confused by Smith's memorandum.[5] It was certainly no model of clarity and Tyler may, in fact, have read the promise of irrevocability as she now claims. It remains, however, that this reading was neither the only possible nor the most reasonable reading of Smith's memorandum which was, in any event, only an informal communication relating to the SPP. Tyler's confusion, even if genuine and caused by Smith's imprecise communication is not enough to support modification of the plan.

For the reasons set forth above, the court concludes that Palmetto GBA (or the Plan Administrator) properly applied the plan language. It necessarily follows that the claim was properly denied even under a de novo standard of review. Allowing for any amount of discretion (to which Palmetto GBA is, in fact, entitled), provides greater support for the denial of benefits.

## CONCLUSION

For the reasons set forth above, Palmetto GBA's motion for judgment is granted and Tyler's motion for judgment is denied. Under the circumstances, the court declines to award attorneys' fees to Defendant. The Clerk of Court is directed to enter judgment in Defendant's favor.

IT IS SO ORDERED.

s/ Cameron McGowan Currie
CAMERON MCGOWAN CURRIE
UNITED STATES DISTRICT JUDGE

Columbia, South Carolina
November 2, 2009

---

[5] Hughes' June 29 memorandum, though somewhat less confusing, is also less than a model of clarity. It is unfortunate that the employer, which was at that time asking employees to make important decisions with very little time for consideration of their options, did not provide more precise information. The errors in communication are, nonetheless, insufficient to modify the terms of the employee benefit plan.

15